1
2
3
4
5

**PROSPER LAW GROUP LLP**
Gordon F. Dickson, Esq. SBN 136857
Deborah P. Gutierrez, Esq. SBN. 240383
5301 Beethoven Street, Suite 109
Los Angeles, California 90066
Telephone:   (310) 893-6200
Facsimile:    (310) 988-2930
deborah@prosperlaw.com

FILED

2011 SEP -7  A 11: 14

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NOR. DIST. OF CALIF.

6
7

Attorneys for Plaintiff,
Vanna Len

E-filing

8

9

ADR

10

11

12

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

13

14

15

16

17

18

19

20

21

22

23

VANNA LEN, an individual,

Plaintiff,

vs.

JPMORGAN CHASE, NA F/K/A
WASHINGTON MUTUAL NA; BANK
OF AMERICA, N.A. F/K/A LASALLE
BANK, NA AS TRUSTEE FOR WA
MUTUAL MORTGAGE PASS-
THROUGH CERTIFICATES WMALT
SERIES 2007-OC2 TRUST; and Does 1
– 10, inclusive,

Defendants.

Case No.

CV11 - 04439

**VERIFIED COMPLAINT FOR:**

1. **DECLARATORY RELIEF [28 U.S.C. §§ 2201, 2202]**
2. **NEGLIGENCE**
3. **QUASI CONTRACT**
4. **VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200, ET SEQ.**
5. **ACCOUNTING**

**DEMAND FOR JURY TRIAL**

24
25
26
27
28

# TABLE OF CONTENTS

I.     STATEMENT OF THE CASE.................................................................3

II.    JURISDICTION, VENUE, AND PARTIES........................................4

III.   INTRODUCTION...........................................................................6

IV.    PLAINTIFF'S LOAN MODIFICATION AND DEBT VALIDATION EFFORTS....................11

V.     PLAINTIFF HAS SUFFERED, AND CONTINUES TO SUFFER, SIGNIFICANT, MONETARY, LEGAL, AND EQUITABLE DAMAGES.........................................................11

VI.    FIRST CAUSE OF ACTION - DECLARATORY RELIEF................................13

VII.   SECOND CAUSE OF ACTION - NEGLIGENCE........................................14

VIII.  THIRD CAUSE OF ACTION - QUASI CONTRACT.....................................15

IX.    FOURTH CAUSE OF ACTION - BUS. AND PROF. CODE SECTION 17200, ET SEQ........16

X.     FIFTH CAUSE OF ACTION - ACCOUNTING...........................................18

# COMPLAINT

COMES NOW Plaintiff Vanna Len ("Plaintiff" or "Mr. Len"), by and through his counsel, for his Complaint against Defendants JPMorgan Bank, NA F/K/A Washington Mutual Bank, NA (in its capacity as originating lender and purported servicer) (hereinafter "**JPMorgan**") and Bank of America, N.A. F/K/A LaSalle Bank, N.A. as Trustee for WA Mutual Mortgage Pass-through Certificates WMALT Series 2007-OC2 Trust (in its capacity as purported assignee of Plaintiff's Deed of Trust) (hereinafter "**Bank of America**"), (collectively "Defendants"), pleads as follows:

## I.   STATEMENT OF THE CASE

1.      Plaintiff alleges that Defendants are third-party strangers to his mortgage loan and have no ownership interest entitling them to collect payment or declare a default. By hiding behind the complexities of the mortgage finance and servicing systems, Defendants brazenly attempt to dupe Plaintiff (and millions of other American homeowners) into believing that they have the right to collect on a debt in which Bank of America has no ownership interest.  Through this action, Plaintiff seeks to stop Defendants' fraudulent practices, discover the true holder in due course of his Promissory Note, and determine the status of any purported lien against the Subject Property.

## II.   JURISDICTION, VENUE, AND PARTIES

2.      This Court has original jurisdiction over the claims in this action based on 28 U.S.C. §§ 2201, 2202, 1331, 1343, and 42 U.S.C. § 1983 which confer original jurisdiction on federal district courts in suits to address the deprivation of rights secured by federal law.

3.      Section 2201(a) of Title 28 of the United States Code states that "[i]n a case of actual controversy within its jurisdiction…any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration. This Court may assert jurisdiction over this action as, Plaintiff has pled that an actual case and controversy exists and the action: 1) does not involve a needless determination of

1   state law issues; 2) does not involve forum shopping; and 3) does not duplicate

2   litigation.[1]

3       4.      This Court has original jurisdiction over the claims in this action based on

4   28 U.S.C. § 1332 which confers original jurisdiction on federal district courts in suits

5   between diverse citizens that involve an amount in controversy in excess of $75,000.00.

6       5.      This Court also has supplemental jurisdiction over the pendant state law

7   claims because they form a part of the same case or controversy under Article III of the

8   United States Constitution, pursuant to 28 U.S.C. § 1367.

9       6.      The unlawful conduct, illegal practices, and acts complained of and alleged

10  in this Complaint were all committed in the Northern District of California and involved

11  real property located in the Northern District of California.  Therefore, venue properly

12  lies in this District, pursuant to 12 U.S.C. § 2614 and 28 U.S.C. § 1391(b).

13      7.      Plaintiff is now, and at all times mentioned herein, an individual residing in

14  the County of Santa Clara.  At all times relevant to this action, Plaintiff has owned real

15  property commonly known as 2257 Bellington Court, San Jose, California, 95138 (the

16  "Property").  Further described as Assessor's Parcel Number 679-17-009, with the

17  following legal description:

18          LOT 7, as delineated upon that certain Map entitled "Tract
            9181," filed for record in the Office of the Recorder of the
19
            County of Santa Clara, State of California, on December 17th,
20          1999 in Book 718 of Maps, at Pages 35 and 36.

21          EXCEPTING THEREFROM the underground water or rights
            thereto with no rights of surface entry, as conveyed to City of
22          San Jose, recorded August 26th, 1999 under Recorder's Serial
            Number 14958101.
23

24      8.      At all relevant times, JPMorgan a National Banking Association organized

25

26      [1] The Ninth Circuit instructs districts courts to first determine whether there is actual
    controversy within its jurisdiction by analyzing the factors enumerated in *Brillhart v. Excess Ins. Co.*,
27  316 U.S. 491 (1942).  The *Brillhart* factors require the Court to 1) avoid needless determination of state
    law issues; 2) discourage litigants from filing declaratory actions as a means of forum shopping; and 3)
28  avoid duplicative litigation. *Brillhart*, 316 U.S. at 495; *see also Schafer v. Citimortgage* No. CV 11–
    03919, 2011 WL 2437267 (C.D. Cal. June 15, 2011).

VERIFIED COMPLAINT                                                          -4-

1  under the laws of the United States with its main office in Columbus, Ohio, as successor

2  by merger to Washington Mutual Bank N.A., which was a national association organized

3  under the laws of the United States with its main office in Nevada.

4         9.     At all relevant times, **Bank of America,** is a national association organized

5  under the laws of the United States with its main office in North Carolina, which

6  acquired LaSalle Bank, NA in 2007, as trustee for WA Mutual Mortgage Pass-through

7  Certificates WMALT Series 2007-OC2 Trust.

8         10.    Plaintiff is ignorant of the true identity and capacity of Defendants

9  designated as Does 1-10, but will amend the Complaint when their identities have been

10  ascertained according to proof at the time of trial.  Plaintiff alleges on information and

11  belief, however, that each and every Doe Defendant is in some manner responsible for

12  the acts and conduct of the other defendants, and were, and are responsible for the

13  injuries, damages, and harm, incurred by Plaintiff.  Plaintiff further alleges on

14  information and belief that each such designated defendant acted, and acts, as the

15  authorized agent, representative, and associate of the other Defendants in doing the

16  things alleged herein.

17         11.    Whenever reference is made in this Complaint to any act of any

18  Defendant(s), that allegation shall mean that each defendant acted individually and

19  jointly with the other defendants.

20         12.    Any allegation about acts of any corporate or other business Defendant

21  means that the corporation or other business did the acts alleged through its officers,

22  directors, employees, agents and/or representatives while they were acting within the

23  actual or ostensible scope of their authority.

24         13.    At all relevant times, each Defendant committed the acts, caused or

25  directed others to commit the acts, or permitted others to commit the acts alleged in this

26  Complaint.  Additionally, some or all of the Defendants acted as the agent of the other

27  Defendants, and all of the Defendants acted within the scope of their agency if acting as

28  an agent of the other.

14.     At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint.  Knowing or realizing that the other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts.  Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

## III.   INTRODUCTION

15.     During the Mortgage Boom Era of 2002 to 2007, when Plaintiff took out his mortgage, Wall Street investors looked to feed their insatiable and reckless greed for profit by tapping directly into the American Dream – homeownership.  Mortgage lenders and Investment Banks aggressively lured the American people into predatory loans with teaser interest rates and into purchasing homes with inflated appraisals under the promise that the booming real estate market would continue to boom.  Wall Street took the soon to be toxic loans and attempted (but failed) to bundle them into "Mortgage Backed Securities" through a process known as "Securitization."  These "securities" were then sold to investors in the form of certificates, whereby the investors became the "Certificateholders" of the securities that were to be fed by the toxic loans.

16.     Knowing that the predatory loans would soon default and turn into toxic assets, Wall Street placed their bets accordingly and bought exotic insurance products in the form of Credit Default Swaps.[2]  Thus, when the Mortgage Boom turned into a

---

[2] In 1995, JP Morgan created the Credit Default Swap (CDS).  Essentially, a CDS is a form of insurance which protects the buyer of the CDS in case of a loan default.  If the loan defaults, the buyer of the CDS can exchange the CDS for the cash value of the defaulted loan.  One difference between a traditional insurance policy and a CDS is that anyone can purchase a CDS, even those who have no direct "insurable interest" in the lender.  This allowed investors to bet against the average American to default on their mortgage with little risk.  CDS insurance was especially attractive to investors who had knowledge of the subprime mortgage industry, as the likelihood of default on those loans was much higher.  At the end of 2007 the outstanding CDS amount was $62.2 *trillion* dollars.

1   Mortgage Meltdown (which it did), they would stand to make even more profit when the

2   mortgage insurance paid them out for their "losses."

3        17.    However, in their rush to "securitize" the predatory loans, Wall Street

4   investment banks failed to actually follow its own rules and regulations, creating the

5   instant situation where the securities are not actually backed by any mortgages at all.

6   Under the standard model, the promissory notes were *supposed* to be sold and

7   transferred into a trust pool ("Securitized Trust") that holds the promissory notes as

8   collateral on the securities ("Certificates") bought by investors ("Certificateholders").

9   These "true sales" allow the original lenders to move the notes off their books,

10  eliminating the need to maintain capital-adequacy reserves against default.  The purpose

11  of securitizing collateral debt obligations was to provide a large supply of money to

12  lenders for originating loans, and to provide investment to bond holders – which were

13  expected to be relatively safe.

14       18.    The Securitized Trusts, if ever formed properly, are subject to and governed

15  by (1) a Pooling and Servicing Agreement ("PSA"); (2) the Mortgage and Loan

16  Purchase Agreement; (3) the 424B5 Prospectus; (4) the common law trust rules of

17  Delaware or New York, depending on its origin, and (5) Internal Revenue Code § 860A

18  through 860G, better known as the Real Estate Mortgage Investment Conduit

19  ("REMIC") rules.

20       19.    An essential aspect of the mortgage securitization process is that the Trust

21  must obtain and maintain good title to the mortgage loans comprising the pool for that

22  certificate offering.  This is necessary in order for the Trustee of the Securitized Trust to

23  be legally entitled to enforce the mortgage loans.  In addition to other required

24  documentation to complete the Collateral File of any given loan, two documents relating

25  to each mortgage loan must be validly transferred to the Trust as part of the

26  securitization process – the promissory note and the security instrument (deed of trust or

27

28

1   mortgage).[3]  In this case, on information and belief, neither instrument was ever

2   transferred in any manner whatsoever.

3       20.    Here, Plaintiff alleges that the "true sales" never took place due to the

4   failure to follow the basic legal requirements for the transfer of a negotiable instrument

5   and thereby, the legal, equitable, and pecuniary interest in Mr. Len's Note and

6   Mortgage.  As a result thereof, Bank of America, which purports to be Mr. Len's

7   creditor, actually has no right, title, or interest in Mr. Len's Note and Mortgage, and has

8   no right to collect mortgage payments, demand mortgage payments, report derogatorily

9   against Mr. Len's credit, or enforce the obligation in any manner whatsoever.

10      21.    Plaintiff further alleges that the Trust that purportedly owns Plaintiff's Note

11  and Mortgage has been dissolved due to the disbursement and receipt of mortgage

12  insurance payouts to Bank of America and the Certificateholders (including, but not

13  limited to, Credit Default Swaps and other mortgage insurance products).  As a result of

14  these mortgage insurance payouts, Bank of America has been paid in full on Plaintiff's

15  debt obligation.

16      22.    Nonetheless, Bank of America and JPMorgan attempt to take advantage of

17  the complex structured finance system to defraud yet another homeowner.  Plaintiff

18  anticipates that Bank of America and JPMorgan will seek a Court-sanctioned bailout by

19  attempting to further mislead Plaintiff into believing that Bank of America and/or

20  JPMorgan is his actual creditor, and is entitled to enforce his obligation, when in fact

21  they are not.

22      23.    Plaintiff does not dispute that he does owe money on his mortgage

23  obligation.[4]  Rather, Plaintiff disputes the amount owed and seeks the Court's assistance

24

25      [3] Plaintiff's allegations are supported by the recent ruling of the Massachusetts Supreme
    Judicial Court in *U.S. Bank vs. Ibanez*, SJC-10694, 2011 WL 38071.  In *Ibanez*, the Court invalidated
26  two foreclosure sales, finding that the lower court did not err in concluding that the securitization
    documents submitted by the bank plaintiffs failed to demonstrate that they were the holders of the
27  mortgages.  The Court rejected the banks' argument that the mortgages were transferred via the
    applicable Pooling and Servicing Agreement and made clear that, to foreclose, the banks must prove a
28  complete and unbroken chain of title from origination to securitization trust in full compliance of the
    PSA, i.e. establish ownership of the mortgage.

1    in determining who the holder in due course is of his Note and Deed of Trust,

2    specifically what rights, if any, Bank of America and/or JPMorgan have to claim a

3    secured or unsecured interest in the Note or Mortgage.

4        24.    Plaintiff's information and belief is based on (1) a title report and analysis

5    of the Property's county records; (2) direct written and oral communication with

6    Defendants; and (3) his counsel's research, experience, and extensive review of

7    depositions, case law, amicus briefs, correspondence, news articles, reports, and publicly

8    available securitization documents and practices; and (4) Bank of America's filings with

9    the Securities and Exchange Commission ("SEC"), including Bank of America's 424B5

10   Prospectus and the PSA.  A true and correct copy of the unexecuted Prospectus is

11   located at:

12   http://www.sec.gov/Archives/edgar/data/1403151/000127727707000490/exh41to8kpsa

13   wmalt07_oc2.htm.

14       25.    On or about June 26, 2007, Mr. Len executed a Note and Mortgage in favor

15   of Washington Mutual, NA ("WA Mutual"), obtaining a loan on the Property.

16       26.    Plaintiff alleges and believes thereon that on or around the time of

17   origination of Mr. Len's loan, WA Mutual attempted to securitize and sell his loan to

18   another entity or entities.  **That entity was *not* Bank of America or JPMorgan.**

19       27.    Plaintiff alleges that WA Mutual never sold his Mortgage to Bank of

20   America or JPMorgan, and that Bank of America and JPMorgan are merely third-party

21   strangers to the loan transaction.  Furthermore, Plaintiff alleges that none of the

22   Defendants or Doe Defendants can demonstrate that Plaintiff's Note was ever properly

23   endorsed and transferred to Bank of America.  In fact, Plaintiff has requested that

24   JPMorgan provide evidence establishing the true and correct owner of his loan.

25

26   ───────────────────────────

27   [4] The Court should not condone JPMorgan and Bank of America's fraudulent and predatory
     mortgage servicing practices and allow it to collect on money it was not owed, simply because
     Plaintiffs do not dispute the fact that they owe money on their mortgage obligation.  Simply put, the

28   Court should not allow JPMorgan or Bank of America to trample over 200 years of well-settled
     property laws just because Plaintiff "owes somebody the money."

1    Although this information should be readily available to any mortgage servicer,

2    JPMorgan has failed to provide any evidence to verify the owner of Plaintiff's

3    Mortgage.

4        28.     The parties involved in the alleged Securitization and transfer of Plaintiff's

5    Note and Mortgage failed to strictly adhere to section 2.01 of the PSA, which requires

6    that Plaintiff's Note and Mortgage be properly endorsed, transferred, accepted, and

7    deposited with the WA Mutual Mortgage Pass-through Certificates WMALT Series

8    2007-OC2 Trust (hereinafter "WA Mutual Trust") (or its custodian) on or before June

9    27, 2007, the "closing date" indicated on the PSA. The "closing date" is the date by

10    which all of the Notes and Mortgages must be transferred into the WA Mutual Trust.

11    The failure to do so results in the Note and Mortgage not being part of the WA Mutual

12    Trust res, such that it is not a debt that Bank of America can attempt to collect on.

13        29.     The failure to deposit and transfer the Note into the WA Mutual Trust

14    before the closing date is a violation of the PSA and of New York trust law.

15    Consequently, Bank of America, as Trustee for the WA Mutual Trust, has no legal or

16    equitable right, title, or interest in Mr. Len's Note and Mortgage, since Bank of America

17    cannot take any action which is not authorized by the Securitization agreements that

18    created and govern the WA Mutual Trust.

19        30.     Plaintiff does not allege or assert that he is a beneficiary of the PSA.

20    Rather, Plaintiff alleges that the failure to securitize his Note makes it impossible for

21    Bank of America and/or JPMorgan to claim, allege or assert that it was assigned,

22    transferred or granted Plaintiff's Note or Mortgage, or any interest therein, in any

23    manner whatsoever. Plaintiff also alleges that the failure to securitize his Note and

24    Mortgage has resulted in an unperfected lien that Defendants cannot enforce in any

25    manner whatsoever.

26        31.     Based on a search of the public records, there has been no assignment

27    located to establish a clear chain of title from WA Mutual Bank to the WA Mutual Trust

28    and/or Bank of America. The inability to locate an assignment further demonstrates that

1   Plaintiff's Note and Mortgage were not deposited into the Trust by the closing date.  The

2   failure to deposit the Note into the WA Mutual Trust before the closing date is a

3   violation of the PSA and of New York trust law.

4       32.    Mr. Len relied on Bank of America and JPMorgan's misrepresentations and

5   has been damaged in the following ways: (1) he has been paying the wrong party for an

6   undetermined amount of time and overpaid in interest that was overcalculated; (2) Mr.

7   Len has expended significant funds to cover the cost of attorneys' fees and related costs;

8   (3) he is unable to determine whether he sent his monthly mortgage payments to the

9   right party; (4) multiple parties may seek to enforce his debt obligation against him; and

10  (5) any would-be buyer of Plaintiff's home will find themselves in legal limbo, unable

11  to know with any certainty whether they can safely buy Plaintiff's home or get title

12  insurance.

13      33.    Plaintiff further alleges that any amount owed under the Note is subject to

14  equitable offset by the actual, consequential, special, and punitive damages owed to

15  Plaintiff from Defendants, which amount is currently unknown, but will be determined

16  upon conducting discovery.  Plaintiff believes this amount will be in excess of the

17  amount of their debt obligation.

18      34.    In addition to seeking compensatory, consequential, punitive and other

19  damages, Plaintiff seeks declaratory relief as to whether the Deed of Trust (Mortgage)

20  secures any obligation of Plaintiff in favor of Defendants.

21  **IV.   PLAINTIFF'S LOAN MODIFICATION AND DEBT VALIDATION**

22        **EFFORTS**

23      35.    Plaintiff applied for a loan modification and followed up numerous times

24  with his assigned agent; however, in the end JPMorgan denied his request for a loan

25  modification.

26      36.    In an effort to verify and validate his debt, Mr. Len sent a Qualified Written

27  Request letter on or around August 3, 2011, pursuant to Real Estate Settlement

28  Procedures Act, 12 U.S.C. § 2605(e), in which he requested that the purported servicer

VERIFIED COMPLAINT                                                    -11-

1  (JPMorgan) provide, among other things, "The name, address, name of a contact person

2  and telephone number of the current holder in due course and owner of the mortgage

3  note." 12 U.S.C. § 2605(e) requires that the servicer provide this information and

4  respond to a written request within 60 days of receipt. *See* **Exhibit "A"**, a true and

5  correct copy of Plaintiff's Qualified Written Request ("QWR"). To date, there has not

6  been a response.

## V.   PLAINTIFF HAS SUFFERED, AND CONTINUES TO SUFFER, SIGNIFICANT MONETARY, LEGAL, AND EQUITABLE DAMAGES

9  37.   The conduct described above by Bank of America and/or JPMorgan was

10  malicious because Defendants knew that they were not acting on behalf of the current

11  pecuniary beneficiary of the Note and Mortgage. However, despite such knowledge,

12  said Defendants represented to Plaintiff that they were agents authorized to collect on

13  Plaintiff's debt.

14  38.   Defendants engaged and are engaging in a pattern and practice of

15  defrauding Plaintiff, in that during the entire life of the mortgage loan, Defendants failed

16  to properly credit payments made; incorrectly calculated interest on the accounts; and

17  failed to accurately debit fees, all of which caused Plaintiff to overpay in principal and

18  interest on his loan.

19  39.   On information and belief, at all times material, Bank of America and

20  JPMorgan had and have actual knowledge that Plaintiff's accounts were not accurate,

21  but that Plaintiff would make further payments based on Defendants' inaccurate

22  accounts.

23  40.   On information and belief, Plaintiff made payments based on the improper,

24  inaccurate and fraudulent representations as to Plaintiff's accounts.

25  41.   As a direct and proximate result of the actions of the Defendants set forth

26  above, Plaintiff overpaid in interest.

27

28

VERIFIED COMPLAINT                                                                    -12-

42. As a direct and proximate result of the actions of the Defendants set forth above, the title to Plaintiff's home has been slandered, clouded and its salability has been rendered unmarketable.

43. As a direct and proximate result of the actions of the Defendants set forth above, Plaintiff does not know who the current beneficiary of his Note and Mortgage actually are, such that he is now subject to double financial jeopardy on one obligation.

44. As a direct and proximate result of the actions of the Defendants set forth above, *multiple* parties can potentially claim an interest in the subject loan.

45. The conduct of Bank of America, JPMorgan and one or more of the Doe Defendants has led to pecuniary damages, as described herein.

46. The title to Plaintiff's Property has been rendered unmarketable and unsalable because of the possibility of multiple claims being made against his Property. If the alleged assignment from WA Mutual to Bank of America and/or the WA Mutual Trust is not found to be invalid for the reasons stated above, Plaintiff will be incurably prejudiced. Plaintiff will be denied the opportunity to identify and negotiate with his *true creditor* and exercise his right to verify and validate his debt.

47. Plaintiff has offered to tender and is ready, willing and able to unconditionally tender his obligation.[5]

---

[5] The standard is **only that Plaintiff makes the offer to tender**, not actually tender. *Alicia v. GE Money Bank*, No C 09-00091 SBA, 2009 WL 2136969 at *3 (N.D. Cal. July 16, 2009) ("…debtor must allege a credible tender of the amount of the secured debt…"). Moreover, tender is *not* required when the owner's action attacks the validity of the underlying debt because the tender would constitute an affirmation of the debt. *Sacchi v. Mortgage Electronic Registration Systems, Inc.*, No. CV 11-1658 AHM, 2011 WL 2533029 (C.D.Cal June 24, 2011), at *16 (emphasis added); citing *Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997); *Stockton v. Newman*, 148 Cal. App. 2d 558, 564 (1957). *See also*, *Foulkrod v. Wells Fargo Financial California Inc.*, No. CV 11-732-GHK (AJWx) (C.D. Cal. May 31. 2011) ("…requiring Plaintiff to tender the amount due on his loan at this time would be illogical and inequitable given that he disputes that Wells Fargo has any rights under the loan.") *See Onofrio v. Rice*, 55 Cal. App. 4th 413, 424 (1997).

# FIRST CAUSE OF ACTION –

## DECLARATORY RELIEF: TO DETERMINE STATUS OF DEFENDANTS'

## CLAIMS [28 U.S.C. §§ 2201, 2202]

### [Against All Defendants and Doe Defendants]

48.     Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

49.     Section 2201(a) of Title 28 of the United States Code states:

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

50.     Section 2202 of Title 28 of the United States Code states:

> Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

51.     Plaintiff alleges that Bank of America and JPMorgan do not have a secured or unsecured legal, equitable, or pecuniary interest in the lien evidenced by the Deed of Trust and that its purported assignment has no value since the Deed of Trust is wholly unsecured.

52.     Defendants claim that Plaintiff's Note and Deed of Trust cannot be determined to be unsecured and that they have an enforceable and secured interest in, and lien against, the Plaintiff's Note, Deed of Trust, and Property.

53.     Thus, the competing allegations made by Plaintiff, above, establish that a real and actual controversy exists as to the respective rights of the parties to this matter, including but not limited to ownership of the Property.

54.    Accordingly, Plaintiff requests that the court make a finding and issue appropriate orders stating that none of the named Defendants or Doe Defendants, have any right or interest in Plaintiff's Note, Deed of Trust, or the Property which authorized them, in fact or as a matter of law, to foreclose or collect Plaintiff's mortgage payments.

55.    As described above, Plaintiff will be denied the opportunity to identify his true and current creditor/lender and exercise his right to cure any alleged default.  He will be denied the right to conduct discovery and have Bank of America and JPMorgan's claim verified by a custodian of records who has personal knowledge of the loan and all transactions related to it.  Plaintiff will also be denied the opportunity to discover the true amount he still owes, minus any illegal costs, fees, and charges.

56.    It is necessary that the Court declare the actual rights and obligations of the parties and make a determination as to whether Bank of America and JPMorgan's claim(s) against Plaintiff is enforceable and whether it is secured or unsecured by any right, title, or interest in Plaintiff's home.

## SECOND CAUSE OF ACTION – NEGLIGENCE

### [Against Bank of America, JPMorgan and Doe Defendants]

57.    Plaintiff hereby incorporates by reference each and every one of the preceding paragraphs as if the same were fully set forth herein.

58.    At all times relevant herein, JPMorgan was acting as a purported agent for Bank of America.  Defendants are jointly and severally liable for Bank of America and/or JPMorgan's negligent and reckless conduct.

59.    Bank of America, as the purported beneficiary of the Note and Deed of Trust, and JPMorgan as the purported mortgage servicer, both have a duty to exercise reasonable care[6] and skill to follow California law with regard to enforcement of

---

[6] Normally lenders and servicers do not owe a borrower a duty of care. *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal. App. 3d 1089, 1093 (1991).  However, a bank may be liable in negligence if it fails to discharge its contractual duties with reasonable care. *Das v. Bank of Am.*, 186 Cal. App. 4th 727, 741 (2010).  Additionally, a bank may be liable for aiding and abetting a tort when it renders "substantial assistance" to a tortfeasor during a business transaction that it knowingly aided in the commission of the tort. *Id.* (citing *Casey v. U.S. Bank Nat. Assn.*, 127 Cal. App. 4th 1138, 1144-45).

VERIFIED COMPLAINT                                                                                      -15-

1   monetary obligations, and to refrain from taking or failing to take any action against

2   Plaintiff that they did not have the legal authority to do.  This includes not collecting or

3   demanding mortgage payments when they do not have the right to enforce the

4   obligation, causing Plaintiff to overpay in interest, making derogatory credit reports to

5   credit bureaus, and failing to keep an accurate accounting of Plaintiff's mortgage

6   payments, credits, and debits (if JPMorgan is in fact the legally authorized mortgage

7   servicer for Plaintiff).

8          60.     Bank of America and JPMorgan have a duty to exercise reasonable care

9   and skill to refrain from taking any action against Plaintiff that they do not have the

10  legal authority to do.  As a direct and proximate result of the reckless negligence, utter

11  carelessness, and blatant fraud of the Defendants as set forth above.

12         61.     As a direct and proximate result of the negligence and carelessness of the

13  Defendants as set forth above, Plaintiff suffered, and continues to suffer, general and

14  special damages in an amount to be determined at trial, including attorneys' fees and

15  costs of bringing suit to dispute, validate, and challenge said Defendants' purported

16  rights to enforce their debt obligation against them.

17          **THIRD CAUSE OF ACTION – QUASI CONTRACT**

18          **[Against Bank of America, JPMorgan and Doe Defendants]**

19         62.     Plaintiffs hereby incorporate by reference each and every one of the

20  preceding paragraphs as if the same were fully set forth herein.

21         63.     Bank of America and/or JPMorgan have benefited by receiving Plaintiff's

22  monthly mortgage payments when actually the obligations to WA Mutual under the

23  Deed of Trust were fulfilled when WA Mutual received the balance on the Note as

24  proceeds of the sale of Plaintiff's Note and Mortgage to a presently unknown entity.

25         64.     The Deed of Trust states that: "Upon payment of all sums secured by this

26  Security Instrument, Lender shall request Trustee to reconvey the Property and shall

27  surrender this Security Instrument and all notes evidencing debt secured by this Security

28  Instrument to Trustee.  Trustee shall reconvey the Property without warranty to the

1    person or persons legally entitled to it." *See*, **Exhibit B**, attached hereto is a true and

2    correct copy of the Plaintiff's Deed of Trust, dated June 26, 2007.

3        65.    Bank of America and/or JPMorgan knowingly accepted payments and

4    retained them for its own use knowing that Bank of America and/or JPMorgan did not

5    acquire an interest in Plaintiff's Note, such that they could accept or keep Plaintiff's

6    payments.

7        66.    It would be inequitable under the circumstances for Bank of America

8    and/or JPMorgan to retain the payments it received from Plaintiff which it knew it was

9    not entitled to and did not have the legal authority to collect.

10       67.    The equitable remedy of restitution when unjust enrichment has occurred is

11   an obligation created by the law, without regard to the intention of the parties, and is

12   designed to restore the aggrieved party to their former position by return of the thing or

13   its equivalent in money.

14       68.    Bank of America and/or JPMorgan have been unjustly enriched by

15   ***wrongfully and knowingly*** collecting monthly payments from Plaintiff when it has no

16   interest in his Note.

17       69.    Plaintiff seeks restitution for any payments he made to Bank of America

18   and/or JPMorgan that were not paid to the lender or beneficiary, if any.

19               **FOURTH CAUSE OF ACTION – VIOLATION OF**

20               **BUS. AND PROF. CODE SECTION 17200, ET SEQ.**

21            **[Against Bank of America, JPMorgan and Doe Defendants]**

22       70.    Plaintiff hereby incorporates by reference each and every one of the

23   preceding paragraphs as if the same were fully set forth herein.

24       71.    Cal. Bus. and Prof. Code section 17200, et seq., prohibits acts of unfair

25   competition, which means and includes any unlawful, unfair or fraudulent business act

26   and conduct which is likely to deceive and is fraudulent in nature. As more fully

27   described above, Defendants' acts and practices are unlawful, fraudulent, and likely to

28   deceive. This conduct is ongoing and continues to this date.

72.   Defendants engaged in fraudulent and deceptive business practices with respect to mortgage loan servicing, assignment of note and deed of trust, and related matters by, among other things:

      (a)   Executing and recording documents without the legal authority to do so;

      (b)   Demanding and accepting payments for debts that were non-existent;

      (c)   Reporting payments as late to credit bureaus without the legal right or authority to do so;

      (d)   Acting as a beneficiary without the legal authority to do so, and;

      (e)   Other deceptive business practices as described herein.

73.   Plaintiff alleges that by engaging in the above described acts and/or practices as alleged herein, Defendants have violated California law, and regulations and said predicate acts are therefore per se violations of Cal. Bus. and Prof. Code section 17200, et seq.

74.   Plaintiff alleges that Defendants' misconduct, as alleged herein, gave, and has given, Defendants an unfair competitive advantage over their competitors.  The scheme implemented by Defendants is designed to defraud California consumers and enrich the Defendants.

75.   The foregoing acts and practices have caused substantial harm to California consumers, including Plaintiff.

76.   By reason of the foregoing, Defendants have been unjustly enriched and should be required to disgorge their illicit profits and/or make restitution to Plaintiff and other California consumers who have been harmed, and/or be enjoined from continuing in such practices pursuant to Cal. Bus. and Prof. Code sections 17203 and 17204. Additionally, Plaintiff is therefore entitled to injunctive relief and attorneys' fees as available under Cal. Bus. and Prof. Code section 17200 and related sections.

77.   As a direct and proximate result of the actions of Defendants and each of them, stated above, Plaintiff has been injured in that a cloud has been placed upon title

1 to Plaintiff's Property and Defendants, have failed to remove this cloud from Plaintiff's

2 title.

3     78.    Plaintiff is entitled to an order compelling Bank of America, JPMorgan and

4 any other defendants claiming an interest in and to the Property to take any and all

5 actions necessary to remove the cloud they have placed upon Mr. Len's title and an

6 order enjoining such Defendants from taking such actions again in the future.

7 **FIFTH CAUSE OF ACTION – ACCOUNTING**

8 **[Against Bank of America, JPMorgan and Doe Defendants]**

9     79.    Plaintiff hereby incorporates by reference each and every one of the

10 preceding paragraphs as if the same were fully set forth herein.

11     80.    Bank of America and/or JPMorgan have held themselves out to be

12 Plaintiff's creditor and mortgage servicer. As a result of this purported relationship with

13 Plaintiff, said Defendants have a fiduciary duty to Plaintiff to properly account for

14 payments made by Plaintiff.

15     81.    As a result of the aforementioned fraudulent and/or negligent conduct,

16 Plaintiff paid Bank of America and/or JPMorgan his mortgage payments for a period of

17 approximately four years. However, for the reasons stated herein, none of this money

18 was actually owed to Bank of America and/or JPMorgan. For that reason, these monies

19 are due to be either credited back to Plaintiff in full or credited to the rightful holder in

20 due course of Plaintiff's Note.

21     82.    The amount of the money due from Defendants to Plaintiff is unknown to

22 Plaintiff and cannot be ascertained without an accounting of the receipts and

23 disbursements of the aforementioned transactions.

24     WHEREFORE, Plaintiff prays as follows:

25     1.    For compensatory, special, and general damages in an amount according to

26 proof at trial, but not less than $5,000,000.00, against all Defendants;

27     2.    For punitive and exemplary damages in an amount to be determined by the

28 Court against all Defendants;

1        3.     For an order compelling Defendants to remove any instrument which does

2   or could be construed as constituting a cloud upon Plaintiff's title to the Property,

3   including the purported Assignment of Deed of Trust;

4        4.     For an order finding that Defendants have no legally cognizable rights as to

5   Plaintiff, the Property, Plaintiff's Promissory Note, Plaintiff's Deed of Trust, or any

6   other matter based on contract or any of the documents prepared by Defendants,

7   tendered to and executed by Plaintiff;

8        5.     The Court issue an order restraining Defendants, their agents or employees

9   from continuing or initiating any action against the Property and enjoining Defendants,

10   their agents or employees from doing so during the pendency in this matter;

11        6.     For an order compelling Defendants to disgorge all amounts wrongfully

12   taken by them from Plaintiff and returning the same to Plaintiff's interest thereon at the

13   statutory rate from the date the funds were first received from Plaintiff;

14        7.     For costs of suit incurred herein;

15        8.     For reasonable attorneys' fees incurred;

16        9.     For such other and further relief as the court may deem proper.

17

18   Dated:       September 1, 2011       PROSPER LAW GROUP, LLP

19

20                              By:

21                              Gordon F. Dickson
                                    Deborah P. Gutierrez

22                              Attorneys for Plaintiff,
                                    Vanna Len

23

24

25

26

27

28

## **VERIFICATION**

I, Vanna Len, am the Plaintiff in the above-entitled action.  I have read the above Verified Complaint, and I have personal knowledge of the matters stated herein except as to those matters stated upon information or belief and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States, that the foregoing is true and correct as executed this ___ day of August 2011, in the City of San Jose, County of Santa Clara.

By: _____

Vanna Len

1

## **DEMAND FOR JURY TRIAL**

2
Plaintiff Vanna Len hereby demands a trial by jury on all claims.

3

4
Dated:        September 1, 2011                              PROSPER LAW GROUP, LLP

5

6
By: _____

7
Gordon F. Dickson
Deborah P. Gutierrez

8
Attorneys for Plaintiff,
Vanna Len

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# PROSPER LAW

PROSPER LAW CORPORATION
5301 BEETHOVEN STREET
SUITE 109
LOS ANGELES, CALIFORNIA 90066
—
TELEPHONE: (800) 808-9798
FAX: (800) 808-0428
WEBSITE: www.prosperlawcorp.com

GORDON F. DICKSON
DEBORAH P. GUTIERREZ

OF COUNSEL:
RICHARD M. GEE ♦
KEITH R. OLIVER
CARLOS A. LLARENA
MICHAEL KIM

♦ MEMBER CA & CO BARS

DIRECTOR OF TRIAL OPERATIONS:
ROBYN NAKAGAWA

SAN FRANCISCO OFFICE
—
450 HARRISON STREET, SUITE 310
SAN FRANCISCO, CALIFORNIA 94105

SAN DIEGO OFFICE
—
701 B STREET, SUITE 234
SAN DIEGO, CALIFORNIA 92101

SENDER'S E-MAIL:
gfdickson@prosperlawcorp.com
Telephone (310) 893-6207

August 3, 2011

<u>Via US Certified Mail #7010 2780 0000 8337 1843</u>

J.P. Morgan Chase Legal Department
CT Corporation System
1801 West Bay Drive NE, Ste 206
Olympia, WA 98502

Re:     **QUALIFIED WRITTEN REQUEST**
         **Loan Number:** 3014036119
         **Our Client:** Vanna Len
         **Property Address:** 2257 Bellington Ct. San Jose, CA 95138

**This letter is a "qualified written request" in compliance with and under the Real Estate Settlement Procedures Act, 12 U.S.C. Section 2605(e).**

To Whom It May Concern:

    Please be advised this office has been retained by Vanna Len ("Mr. Len") in regards to the accounting and servicing of this loan and the need for understanding and clarification of various sales, transfers, funding sources, legal and beneficial ownership, charges, credits, debits, transactions, reversals, actions, payments, analyses and records related to the servicing of this account from its origination to the present date. The subject property is located at 2257 Bellington Ct. San Jose, CA 95138.

    This letter concerns sales and transfers of mortgage servicing rights; deceptive and fraudulent servicing practices to enhance balance sheets; deceptive, abusive, and fraudulent accounting tricks and practices that may have also negatively affected any credit rating, mortgage account and/or the debt or payments that my clients may be legally obligated to.

    Please provide the following information:

1.   A complete life of loan transactional history;

2.  The Transaction Codes for the software platform of the Servicer;

3.  The Code definitions in plain English;

4.  The Key Loan Transaction history, bankruptcy work sheet (if any), or any summary of all of the accounts in an XL spreadsheet format;

5.  The MERS Milestone Reports and the Edgar website address for the Pooling and Servicing Agreement, Prospectus and Prospectus Supplement;

6.  The name, address, name of a contact person and telephone number of the current holder in due course and owner of the mortgage note;

7.  Copies of all collection notes and communications files;

8.  An itemized statement of the amount needed to fully reinstate the loan;

9.  All communications with any non-lawyer third-party providers; and

10. All Form P-309 screen shots of all system accounts (principal, interest, escrow, late charges, legal fees, property inspection fees, property preservation fees, broker price opinion fees, statutory expense fees, miscellaneous fees, corporate advance fees, trustee suspense accounts, debtor suspense accounts) associated with the loan.

Under RESPA, this information must be provided and cannot be claimed as "confidential," "proprietary," or otherwise private. Failure to disclose the requested information will be considered failure to comply with this Qualified Written Request and thus a violation of 15 U.S.C. section 1601.

I also hereby demand that a chain of transfer from J.P. Morgan Chase to wherever the security currently is be promptly sent to my office. Absent the actual evidence of the security, Mr. Len has no choice but to dispute the validity of J.P. Morgan Chase's lawful ownership, funding, entitlement right, and the current debt J.P. Morgan Chase claims Mr. Len owes. By debt I am referring to the principal balance J.P. Morgan Chase claims Mr. Len owes; the calculated monthly payment, calculated escrow payment and any fees claimed to be owed by J.P. Morgan Chase or any trust or entity J.P. Morgan Chase may service or sub-service for.

To independently validate this debt, my office needs to conduct a complete exam, audit, review and accounting of this mortgage account from its inception through the present date. Upon receipt of this letter, please refrain from reporting any negative credit information (if any) to any credit-reporting agency until responses are provided to each of the requests.

I also request that J.P. Morgan Chase conduct J.P. Morgan Chase's own investigation and audit of this account since its inception to validate the debt J.P. Morgan Chase currently claims Mr. Len owes. I would like J.P. Morgan Chase to validate the debt so that it is accurate.

Please be aware that potential abuses by J.P. Morgan Chase or previous servicing companies could have deceptively, wrongfully, unlawfully, and/or illegally:

- Increased the amounts of monthly payments;
- Increased the principal balance Mr. Len owes;

- Increased the escrow payments;
- Increased the amounts applied and attributed toward interest on this account;
- Decreased the proper amounts applied and attributed toward the principal on this account; and/or;
- Assessed, charged and/or collected fees, expenses and miscellaneous charges Mr. Len is not legally obligated to pay under this mortgage, note and/or deed of trust.

Again, this is a Qualified Written Request under the Real Estate Settlement Procedures Act, codified as Title 12 section 2605(e) of the United States Code as well as a request under the Truth In Lending Act 15 U.S.C. section 1601. RESPA provides substantial penalties and fines for non-compliance or failure to answer the questions provided in this letter within sixty (60) days of its receipt.

Upon receipt of the documents and answers, an exam and audit will be conducted that may lead to a further document request and answers to questions under an additional RESPA Qualified Written Request letter.

**Default Provisions under this QUALIFIED WRITTEN REQUEST**

J.P. Morgan Chase or any agents, transfers, or assigns' omissions of, or agreement by silence to this RESPA REQUEST via certified rebuttal of any and all points herein this RESPA REQUEST, agrees and consents to, including but not limited by, any violations of law and/or immediate termination and/or removal of any and all right, title and interest (liens) in Mr. Len's, or any property or collateral, connected to Mr. Len's or loan number 3014036119, and waives any and all immunities and/or defenses to claims and/or violations agreed to in this RESPA REQUEST, including but not limited to:

1.     Mr. Len's right to, by J.P. Morgan Chase's breach of fiduciary responsibility, fraud, and/or misrepresentation, revoke and rescind any and all power of attorney or appointment J.P. Morgan Chase may have or may have had in connection with loan number 3014036119, and any property and/or real estate connected with loan number 3014036119;

2.     Mr. Len's right to have any certificated or uncertificated security re-registered in Mr. Len's, and only Mr. Len's name;

3.     Mr. Len's right of collection via J.P. Morgan Chase's liability insurance and/or bond;

4.     Mr. Len's entitlement in filing and executing any instruments, as power of attorney for and by J.P. Morgan Chase ,including but not limited to a new certificated security or any security agreement perfected by filing a UCC Financing Statement with the Secretary of State in the State where J.P. Morgan Chase is located;

5.     J.P. Morgan Chase's right to damages because of J.P. Morgan Chase's wrongful registration and breach of intermediary responsibility with regard to Mr. Len's asset, by way of J.P. Morgan Chase issuing to Mr. Len a certified check for the original value of Mr. Len's monetary instrument;

6.      Mr. Len's right to have loan number 3014036119 completely set off because of J.P. Morgan Chase's wrongful registration and breach of intermediary responsibility with regard to Mr. Len's monetary instrument/asset by J.P. Morgan Chase's sending confirmation of set off of wrongful liability of Mr. Len and issuing a certified check for the difference between the original value of Mr. Len's monetary instrument/asset and what Mr. Len mistakenly sent to J.P. Morgan Chase as a payment for such wrongful liability.

J.P. Morgan Chaseor any of J.P. Morgan Chase's transfers, agents or assigns offering a rebuttal of this RESPA REQUEST must do so in the manner of this RESPA REQUEST in accordance of and in compliance with current statutes and/or laws - signing in the capacity of a fully liable man or woman being responsible and liable under the penalty of perjury, while offering direct testimony with the official capacity as appointed agent for J.P. Morgan Chase in accordance with J.P. Morgan Chase's Articles of Incorporation, by-laws duly signed by a current and duly sworn under oath director(s) of such corporation/ Holding Corporation/ National Association.

Any direct rebuttal with certified true and complete accompanying proof must be posted with the Notary address herein within sixty days. When no verified rebuttal of this RESPA REQUEST is made in a timely manner, a "Certificate of Non-Response" serves as J.P. Morgan Chase's judgment and consent/agreement by means of silence with any and all claims and/or violations herein-stated in the default provisions or any other law.

Power of Attorney: When J.P. Morgan Chase fails by not rebutting to any part of this RESPA REQUEST, J.P. Morgan Chase agrees with the granting unto Mr. Len unlimited Power of Attorney and any and all full authorization in signing and endorsing J.P. Morgan Chase's name upon any instruments in satisfaction of the obligations of this RESPA REQUEST/Agreement or any agreement arising from this agreement. Pre-emption of or to any Bankruptcy proceeding shall not discharge any obligations of this agreement. Consent and agreement with this Power of Attorney by J.P. Morgan Chase waives any and all claims and/or defenses of J.P. Morgan Chase, and remains in effect until the satisfaction of all obligations by J.P. Morgan Chase have been satisfied.

If you have any questions, please do not hesitate to contact my office.


Sincerely,

Gordon F. Dickson, Esq.
*Managing Attorney*

# EXHIBIT B



OLD REPUBLIC TITLE CO.
0617005314·NSM

Recording Requested By:
WASHINGTON MUTUAL BANK   FA

Return To:
WASHINGTON MUTUAL BANK   FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

Prepared By:
CORINA CISNEROS

| DOCUMENT: 19489875 | | Pages: 23 |
|---|---|---|
| | Fees.. | 75.00 |
| | Taxes | |
| | Copies.. | |
| | AMT PAID | 75.00 |

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Old Republic Title Company

RDE # 001
6/29/2007
1:30 PM

———————— [Space Above This Line For Recording Data] ————————

ZCA1
M39

# DEED OF TRUST

3014036119-068

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   JUNE 26, 2007
together with all Riders to this document.

(B) "Borrower" is   VANNA LEN, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

Borrower's address is   2257 BELLINGTON COURT, SAN JOSE, CA 95138
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is   WASHINGTON MUTUAL BANK, FA

Lender is a   FEDERAL SAVINGS BANK
organized and existing under the laws of   THE UNITED STATES OF AMERICA

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3005 1/01

—6(CA) (0207)

Page 1 of 15       Initials:

VMP MORTGAGE FORMS - (800)521-7291



Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV
89014
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is  CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP

(E) "Note" means the promissory note signed by Borrower and dated JUNE 26, 2007
The Note states that Borrower owes Lender ONE MILLION FIVE HUNDRED THOUSAND AND
00/100                                                                              Dollars
(U.S. $   1,500,000.00   ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than JULY 01, 2047
(F) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower (check box as applicable):

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                      of SANTA CLARA                                   :
           [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]
THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT
AND IS MADE A PART HEREOF.

Parcel ID Number:  679-17-009                          which currently has the address of
2257 BELLINGTON COURT                                                            [Street]
SAN JOSE                                                  [City], California 95138      [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

Initials: _____

-6(CA) (0207)                         Page 3 of 15                         Form 3005 1/01

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

Initials: _VL_

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Initials: _____

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

Initials: _____

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.

ZCA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

   **25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

   BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                                                                          -Borrower

                                          **VANNA LEN**

_____          _____ (Seal)
                                                                                          -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                  -Borrower

State of California
County of  SANTA CLARA

On  6/26/07                              before me, ~Vanna Len~ Az    *Notary Public*
                                                                      *Alice Gill*
VANNA LEN                                                             personally appeared

~personally known to me~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the ~entity upon behalf of which the person(s)~ acted, executed the instrument.
WITNESS my hand and official seal.

```
ALICE Y. GILL
Commission # 1701048
Notary Public - California
Alameda County
My Comm. Expires Oct 26, 2010
```
                                                                      (Seal)

—6(CA) (0207)                    Page 15 of 15          Initials: VL          Form 3005 1/01

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _____Alameda_____ } ss.

On ___6-29-07____, before me, __Jami Lynn Hiller, Notary Public__
     Date                                Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally    appeared    _____Vanna J Len_____,
                                        Name(s) of Signer(s)

☐ personally known to me

☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**JAMI LYNN HILLER**
Commission # 1708444
Notary Public - California
Alameda County
My Comm. Expires Nov 17, 2010

WITNESS my hand and official seal.

*Jami Lynn Hiller*
Signature of Notary Public

Place Notary Seal Above

---

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _____

Document Date: _____    Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | | Signer's Name: _____ |
|---|---|---|
| ☐ Individual | | ☐ Individual |
| ☐ Corporate Officer — Title(s): _____ | | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | RIGHT THUMBPRINT OF SIGNER Top of thumb here | ☐ Partner — ☐ Limited ☐ General |
| ☐ Attorney in Fact | | ☐ Attorney in Fact |
| ☐ Trustee | | ☐ Trustee |
| ☐ Guardian or Conservator | | ☐ Guardian or Conservator |
| ☐ Other: _____ | | ☐ Other: _____ |
| Signer Is Representing: _____ | | Signer Is Representing: _____ |

© 2004 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402    Item No. 5907    Reorder: Call Toll-Free 1-800-876-6827

**ORDER NO. :** 0617005314-MM

# EXHIBIT A

The land referred to is situated in the County of Santa Clara, City of San Jose, State of California, and is described as follows:

LOT 7, as delineated upon that certain Map entitled "Tract 9181", filed for record in the Office of the Recorder of the County of Santa Clara, State of California, on December 17th, 1999 in Book 718 of Maps, at Pages 35 and 36.

EXCEPTING THEREFROM the underground water or rights thereto with no rights of surface entry, as conveyed to City of San Jose, recorded August 26th, 1999 under Recorder's Serial Number 14958101.

679-17-009
17 028
SH/SK/KH
T718-35-7

RMTA
M39

3014036119-068

# ADJUSTABLE RATE RIDER
## (12-MTA Index - Payment and Rate Caps)

3014036119

THIS ADJUSTABLE RATE RIDER is made this ____26TH____ day of ____JUNE, 2007_____, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to ____WASHINGTON MUTUAL BANK, FA_____ (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

2257 BELLINGTON COURT, SAN JOSE, CA 95138
### (PROPERTY ADDRESS)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __115%____ OF THE ORIGINAL AMOUNT (OR $____1,725,000.00_____). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of the Note, I will pay interest at a yearly rate of ___8.347_%. Thereafter until the first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate of __1.200____%. The interest rate I will pay will thereafter change in accordance with Section 4 of the Note.

3014036119

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the <u>1ST</u> day of <u>AUGUST, 2007</u>, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Interest Rate Change**

Before each Change Date, the Note Holder will calculate my new interest rate by adding <u>THREE AND 325/1000</u> percentage points <u>3.325</u> % ("Margin") to Current Index. The Note Holder will then round the result of this addition to the nearest one thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). The difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than <u>10.250</u> % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing <u>AUGUST 01, 2008</u>, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the

3014035119

amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to __115%__ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that __115%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

3014036119

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

3014036119

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

3014036119

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

VANNA LEN